No. 18-5047

[ORAL ARGUMENT NOT YET SCHEDULED]

**UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT**
_____

NATIONAL SECURITY COUNSELORS, INC.,

*Plaintiff-Appellant*,

v.

CENTRAL INTELLIGENCE AGENCY, *et al.*,

*Defendant-Appellees.*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
No. 1:14-cv-00444, No. 1:14-cv-00445
(Beryl A. Howell, C.J.)
_____

**BRIEF FOR PLAINTIFF-APPELLANT**
_____

Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff-Appellant*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Appellant National Security Counselors, Inc., by and through undersigned counsel, certifies the following:

## I.    Parties and Amici

The parties to this case are the Appellant National Security Counselors, Inc. and the Appellees Central Intelligence Agency, Defense Intelligence Agency, Department of Justice, and Office of the Director of National Intelligence.  There are no *amici curiae* so far.

## II.    Rulings Under Review

Appellant seeks review of the Orders issued by the District Court on 17 October 2012, 14 March 2013, 29 April 2013, 15 August 2013, 6 September 2016, and 3 November 2016 (Howell, C.J.).

## III.    Related Cases

This case was not previously before this Circuit or any other court.  It is related to the District Court case *National Security Counselors v. CIA*, No. 12-284.

Date: February 6, 2019

Respectfully submitted,


 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, Appellant National Security Counselors, Inc.

hereby informs the Court that it has no parent corporation and that no publicly held

corporation owns 10% or more of its stock.

Date: February 6, 2019

 /s/ Kelly B. McClanahan  
Kelly B. McClanahan, Esq.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.....i

CORPORATE DISCLOSURE STATEMENT ................................................ii

TABLE OF CONTENTS................................................................................iii

TABLE OF AUTHORITIES .........................................................................v

GLOSSARY ...............................................................................................viii

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF ISSUES...........................................................................1

STATEMENT OF THE CASE......................................................................2

STATEMENT OF FACTS ............................................................................4

     *CIA's Refusal to Process Requests*............................................4

     *CIA's Failure to Perform Adequate Searches* ........................5

     *Exemptions* ..............................................................................8

     *Sanctions and Related Matters*...............................................11

SUMMARY OF ARGUMENT ....................................................................13

ARGUMENT ..............................................................................................14

     I.     STANDARD OF REVIEW .........................................14

     II.    CIA'S REFUSAL TO PROCESS REQUESTS.........................14

          A.    SORTING A DATABASE IS NOT CREATING A
               RECORD...............................................................15

B.   CIA CANNOT HIDE BEHIND THE CONFIGURATION OF ITS RECORDS SYSTEMS ..........................................19

C.   CIA CANNOT OVERGENERALIZE A REQUEST TO MAKE IT OVERBROAD ...............................................26

D.   CIA'S PRACTICE OF NOT WORKING WITH REQUESTERS IS REVIEWABLE UNDER THE APA...29

III.  CIA PERFORMED INADEQUATE SEARCHES .....................31

A.   CIA PERFORMED AN INADEQUATE SEARCH FOR IMS SEARCH TOOLS AND DATABASES...................32

B.   NSC DID NOT WAIVE ITS RIGHTS TO CHALLENGE CIA'S SEARCH ..............................................................36

IV.  AGENCIES IMPROPERLY WITHHELD INFORMATION .....39

A.   CIA IMPROPERLY WITHHELD PREVIOUSLY OFFICIALLY DISCLOSED INFORMATION ...............39

B.   ALL AGENCIES IMPROPERLY INVOKED EXEMPTION (B)(5) ..........................................................46

1.   Deliberative Process Privilege ...............................48

2.   Attorney-Client Privilege ........................................51

V.   SANCTIONS AND REFERRAL TO OSC SHOULD BE ORDERED ...................................................................................54

CONCLUSION ......................................................................................55

CERTIFICATE OF SERVICE....................................................................56

CERTIFICATE OF COMPLIANCE ..........................................................57

# TABLE OF AUTHORITIES

**Cases:** **Pages**

*Abdul-Alim v. Wray*, 277 F. Supp. 3d 199 (D. Mass. 2017)...........................48

*Arista Records LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010)...........................25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).........................................................25

*Assassination Archives & Research Ctr., Inc. v. CIA*, 720 F. Supp. 217
(D.D.C. 1989) ........................................................................................19

*Borda v. DOJ*, 245 F. Supp. 3d 52 (D.D.C. 2017)..........................................48

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S.
837 (1984) ...........................................................................................20

*Citizens for Responsibility & Ethics in Wash. v. FEC*, 711 F.3d 180 (D.C.
Cir. 2013)..............................................................................................26

*Davis v. DOJ*, 968 F.2d 1276 (D.C. Cir. 1992) .............................................40

*Dominion Resources, Inc. v. United States*, 219 F.3d 359 (4th Cir. 2000).......20

*Ecological Rights Found. v. FEMA*, No. 16-5254, 2017 U.S. Dist.
LEXIS 197451 (N.D. Ca. Nov. 30, 2017) ............................................48

*Edelman v. SEC*, 239 F. Supp. 3d 45 (2017) .................................................48

*Elec. Frontier Found. v. DOJ*, 739 F.3d 1 (D.C. Cir. 2014) ...........................50

*Forsham v. Harris*, 445 U.S. 169 (1980)........................................................16

*Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249
(D.N.M. 2003) ......................................................................................31

*\*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997).......................................53

*In re Von Bulow*, 828 F.2d 94 (2d Cir. 1987) ...............................................53

*Int'l Diatomite Producers Ass'n v. SSA*, No. 92-1634, 1993 WL 137286 (N.D. Cal. Apr. 28, 1993) .......................................................19

*\*Judicial Watch v. Exp.-Imp. Bank*, 108 F. Supp. 2d 19 (D.D.C. 2000) ..........27

*Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009) ..................................14

*McCready v. Nicholson*, 465 F.3d 1 (D.C. Cir. 2006) ......................................14

*\*Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242 (D.C. Cir. 1977) .......................................................................................18

*Meeropol v. Meese*, 790 F.2d 942 (D.C. Cir. 1986)........................................28

*\*Nat'l Sec. Counselors v. CIA*, 320 F. Supp. 3d 200 (D.D.C.) .......................35

*People for the Am. Way Found. v. DOJ*, 451 F. Supp. 2d 6 (D.D.C. 2006) ...................................................................................…16, 18

*R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015)................................31

*Schladetsch v. HUD*, No. 99-0175, 2000 WL 33372125 (D.D.C. Apr. 4, 2000) .......................................................................................19

*Toibb v. Radloff*, 501 U.S. 157 (1991).........................................................20

*Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022 (D.C. Cir. 1999).................................................................46

*Truitt v. Dep't of State*, 897 F.2d 540 (D.C. Cir. 1990) ...........................…20, 21

*\*Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008).........30

*\*Winston & Strawn, LLP v. McLean*, 843 F.3d 503 (D.C. Cir. 2016)...…38, 46

**Statutes and Rules:**

5 U.S.C. § 552 ...................................………..…1, 11, 47, 54

28 U.S.C. § 1331...............................................................................................1

32 C.F.R. § 1900.....................................………5, 20, 22, 29, 32

70 Fed. Reg. 42418 (July 22, 2005) ..........................................……33, 34

Fed. R. Civ. P. 56(c) ..........................................................................14

**Legislative History:**

120 Cong. Rec. 6,807 (1974) ...........................................................21

120 Cong. Rec. 6,809 (1974) ...........................................................21

H. Rep. 93-876, 93d Cong., 2d Sess. (1974) ...................................21

*H.R. Rep. 104-795, 104th Cong., 2d Sess. (1996)..............................……16, 18

S. Rep. 93-854, 93d Cong., 2d Sess. (1974) ..........................................……20, 21

# **GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| CADRE | CIA Automated Declassification Release Environment |
| CIA | Appellee Central Intelligence Agency |
| CMCG | CIA Classification Management and Collaboration Group |
| DIA | Appellee Defense Intelligence Agency |
| DOJ | Appellee Department of Justice |
| FOIA | Freedom of Information Act |
| FBI | Federal Bureau of Investigation |
| IMS | CIA Office of Information Management Services |
| ISCAP | Interagency Security Classification Appeals Panel |
| JA | Joint Appendix |
| NSC | Appellant National Security Counselors, Inc. |
| ODNI | Appellee Office of the Director of National Intelligence |
| OGC | CIA Office of General Counsel |
| OLC | DOJ Office of Legal Counsel |
| OSC | Office of Special Counsel |
| PRB | CIA Prepublication Review Board |

| | |
|---|---|
| SMART2 | Space Management and Retirement Tracking System |
| SORN | Privacy Act Systems of Records Notice |

2

## JURISDICTIONAL STATEMENT

Appellant National Security Counselors, Inc. ("NSC") invoked the District Court's jurisdiction against the Central Intelligence Agency ("CIA"), Defense Intelligence Agency ("DIA"), Department of Justice ("DOJ"), and Office of the Director of National Intelligence ("ODNI") in three related cases under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and 28 U.S.C. § 1331.  Joint App'x at 47, 55, 77 [hereinafter "JA"].

On 6 September and 3 November 2016, the Honorable Beryl A. Howell ("the District Court") issued Final Orders granting summary judgment to the Government.  *Id.* at 44-45, 3973.  NSC noticed appeals against the Government on 12 February 2018.  *Id.* at 4052-61.  This Court consolidated the two cases into the instant case on 29 March 2018.

## STATEMENT OF ISSUES

1. Whether the District Court erred in concluding that CIA had properly refused to process numerous requests?

2. Whether the District Court erred in denying NSC's motion for leave to file an amended complaint?

3. Whether the District Court erred in concluding that NSC failed to allege a final agency action regarding CIA's "Work With Policy?"

4. Whether the District Court erred in concluding that CIA had conducted adequate searches?

5. Whether the District Court in concluding that the agencies released all non-exempt information?

6. Whether the District Court erred in concluding that sanctions were not warranted?

## STATEMENT OF THE CASE

The three cases underlying this action were brought by NSC against CIA, DIA, DOJ, and ODNI under FOIA and the Administrative Procedure Act ("APA") in response to determinations made by those agencies and the agency policies or practices which were revealed by those determinations. Over the course of over five years, the Government filed numerous motions to dismiss and motions for summary judgment before the District Court on all counts, winning some and losing some. The District Court adjudicated all of these motions, as well as several corollary disputes. Portions of the following six District Court decisions are in controversy in this case:

- Memorandum Opinion of 17 October 2012 – This opinion addressed dispositive motions in all three cases. *Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233 (D.D.C. 2012) [hereinafter *NSC-I*] (also JA at 1499-1581).

· Memorandum and Order of 14 March 2013 – This order addressed NSC's motion for leave to file an amended complaint in Case No. 11-444. *Nat'l Sec. Counselors v. CIA*, No. 11-444, 2013 U.S. Dist. LEXIS 202287 (D.D.C. Mar. 14, 2013) (also JA at 2504-09).

· Minute Order of 29 April 2013 – This order addressed NSC's renewed motion for leave to file an amended complaint in Case No. 11-444. JA at 18.

· Memorandum Opinion of 15 August 2013 – This opinion addressed dispositive motions in all three cases. *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101 (D.D.C. 2013) [hereinafter *NSC-II*] (also JA at 2548-2710).

· Memorandum Opinion of 6 September 2016 – This opinion addressed dispositive motions in both remaining cases.[1] *Nat'l Sec. Counselors v. CIA*, 206 F. Supp. 3d 241 (D.D.C. 2016) [hereinafter *NSC-III*] (also JA at 3973-4051).

· Minute Order of 3 November 2016 – This order addressed NSC's motion for reconsideration in Case No. 11-445. JA at 44-45.

This case involves challenges to both specific denials of records as well as to overarching CIA policies, patterns, or practices which violate FOIA and/or the

3

APA.  While the majority of the issues originally in controversy have been resolved

(and are therefore not part of this appeal), a number of issues remain in controversy.

These issues can be roughly divided into four categories: (1) CIA's refusal to

process requests in certain circumstances; (2) CIA's failure to perform adequate

searches for information responsive to some of NSC's requests; (3) all agencies'

improper withholding of information responsive to some of NSC's requests; and (4)

the appropriateness of sanctions or referral of the case to the Office of Special

Counsel ("OSC").

NSC timely appealed the District Court's Judgments.

## STATEMENT OF FACTS

*CIA's Refusal to Process Requests:*

On 8 August 2010, NSC submitted to CIA four FOIA requests for database

listings of all FOIA requesters from Fiscal Years 2008-2010 according to the fee

categories to which CIA assigned them.  JA at 103-15.  CIA refused to process

these requests, stating that doing so would require it to create a record, collect

information, conduct research, or analyze data.  *Id.* at 116-19.  The District Court

agreed with CIA, holding that sorting a database and producing the resulting list

requires the creation of a record.  *See NSC-I* at 271-72.

---

[1] Cases No. 11-443 and 11-444 were consolidated on 2 April 2014.  JA at 10.

Relatedly, CIA has demonstrated a practice of broadly refusing to process reasonable requests, providing no reason for the refusal beyond generalized references to "breadth and lack of specificity" and "the way in which our records systems are configured." *See* JA at 125-81.  Among these requests was a request for CIA records about the IBM supercomputer named "Watson," which NSC filed on 11 February 2011 and CIA refused to process on 2 March 2011.  *Id.* at 275-80. The District Court agreed with CIA, finding that conducting a search "would require the CIA to 'search every office for any documents containing the word 'Watson' because 'any component is equally likely to have responsive records.'" *See NSC-II* at 163.

Further exacerbating this problem, CIA has demonstrated a practice of refusing to discuss such allegedly improper requests with requesters, despite being required to by its own published regulation: "Communications which do not meet the[] requirements [of reasonably describing the records sought and not requiring an unreasonable search] will be considered an expression of interest and the Agency will work with, and offer suggestions to, the potential requester in order to define a request properly."  32 C.F.R. § 1900.12(c).  Instead of working with requesters to correct the deficiencies identified by CIA in their requests, CIA instead sends rejection letters which either contain formulaic suggestions about how to improve a request (e.g., "documents must be locatable through the indexing to our various

5

records," JA at 127-28, 133, 350, 368, 372, 438) or no suggestions at all, *see id.* at 127-81, and if a requester attempts to appeal such a rejection, CIA refuses to accept it, *id.* at 125. The District Court avoided addressing this question on the merits, holding that the "work with" practice was not a final agency action which could be litigated under the APA. *See NSC-I* at 282.

*CIA's Failure to Perform Adequate Searches:*

On 26 January 2011, NSC submitted to CIA a FOIA request for records about the search tools and indices used by the Office of Information Management Services ("IMS")—CIA's FOIA office—for conducting searches of its own records. *Id.* at 282. It based this request on the reference to "existing indices and finding aids" in CIA's regulations, 32 C.F.R. § 1900.12(m), and consistent CIA references to "search tools [and] indices" in declarations filed in FOIA cases, *e.g.*, JA at 494-95, 752, 2515, 2991, 3005, 3008. CIA identified and released three records in response to this request. *NSC-III* at 259. The District Court found that CIA had performed an adequate search. *Id.* at 259.

Between 8 December 2009 and 9 February 2010, NSC submitted to CIA a FOIA request for records associated with the administrative processing of several other FOIA requests. JA at 749-51. After initially being denied summary judgment on the matter, CIA released several responsive records to NSC. *Id.* at 3031-65, 3159-3492. Many of these records were screenshots of CIA's FOIA processing

software in which text is visibly missing. *See id.* at 3031-65*; see also id.* at 3496 (claiming that screenshots "are the best available copies of these materials and reflect all of the information that can be viewed in a CADRE entry short of having actual access to the system"). The District Court avoided addressing this question on the merits, holding that NSC had waived its right to challenge the adequacy of CIA's search by not challenging it before the evidence was released. *See NSC-III* at 262.

On 6 February 2010, NSC submitted to CIA a FOIA request for "all current training handbooks, manuals, guidelines, checklists, worksheets, and similar documents provided to CIA FOIA and Privacy Act analysts (both agency employees and contractors)." *Id.* at 751. After initially being denied summary judgment on the matter, CIA released several responsive records to NSC. *Id.* at 3066-3158. Many of these records included numerous explicit references to other documents which were not produced. For example, several such records constituted sections of a 20-part manual, *see id.* at 3066-67, of which only nine sections were actually processed, *see id.* at 3068-88. CIA later defended the adequacy of its search by arguing that the referenced records were non-responsive. *Id.* at 3498-99. The District Court avoided addressing this question on the merits, holding that NSC had waived its right to challenge the adequacy of CIA's search by not challenging it before the evidence was released. *See NSC-III* at 262.

*Exemptions:*

On 12 May 2010, NSC submitted to CIA a FOIA request for all Tables of Contents from CIA's in-house journal *Studies in Intelligence*. *Id.* at 507. Over the course of this litigation, CIA released a significant majority of the responsive records, *id.* at 1935-2357, but withheld a significant amount of information under Exemptions (b)(1) and/or (b)(3). NSC demonstrated that several of the withheld items had been previously officially disclosed and could therefore not be withheld under any exemption, *see id.* at 1708-1932, and CIA argued that it had released all of the information *it* had unilaterally determined was previously officially disclosed, not all of the information that *NSC* had demonstrated was previously officially disclosed. *See NSC-III* at 254. The District Court found that CIA had released all previously officially disclosed information. *See NSC-II* at 169-70; *NSC-III* at 256. In doing so, the District Court held that CIA had no affirmative duty to determine if information had been previously officially disclosed (e.g., by disclosure on CIA's website or in CIA publications) before withholding it, *NSC-II* at 169, even if it committed to doing so. *See NSC-III* at 256.

Besides the article titles withheld in these Tables of Contents, which were specifically addressed by the District Court, NSC also challenged the withholding of the names of several article authors. The District Court avoided addressing this question on the merits, holding that NSC had waived its right to challenge those

withholdings before it was obvious that they were wrongly withheld. *See NSC-II* at 170 n.37; *NSC-III* at 256-57.

All four agencies withheld additional material under Exemption (b)(5). Citing the deliberative process privilege, CIA, DIA, and ODNI withheld a significant amount of information from administrative processing materials and training and reference documents, including lists of search terms used during FOIA processing, the results of those searches, and other processing-related information. *See NSC-III* at 274, 280, 282-83. After initially finding that these agencies had not justified these withholdings, the District Court ultimately found that they had met their burden. *See id.* at 277 (CIA search terms and results), 279 (CIA reference documents), 280-81 (DIA processing materials), 282-83 (ODNI processing materials).

Citing the attorney-client privilege, CIA successfully withheld information from reference documents. *Id.* at 285-86. DOJ made significantly more extensive use of this privilege, originally withholding sixteen Office of Legal Counsel ("OLC") opinions, *NSC-II* at 196, before being required to release redacted copies of two of them under the prior disclosure doctrine. *See id.* at 198-99. Despite holding that DOJ had not demonstrated that it had released all reasonably segregable non-exempt information, *id.* at 207, the District Court found that DOJ

had met its burden to justify the withholding of thirteen opinions in their entirety. *Id.* at 199.

In ordering the reprocessing of two OLC opinions, the District Court addressed both the prior disclosure doctrine and the argument that the material is not privileged, *see id.* at 197 n.70, observing that under the latter theory, the District Court addressed both the prior disclosure doctrine and the argument that the material is not privileged, *see id.* at 197 n.70, observing that under the latter theory, "voluntary disclosure of privileged material subject to the attorney-client privilege to unnecessary third parties in the attorney-client privilege context 'waives the privilege, not only as to the specific communication disclosed but often as to all other communications relating to the same subject matter.'" *Id.* at 198. Despite this ruling, DOJ released a redacted version of the two opinions in question, in which only the exact information which had been previously disclosed was revealed. *See NSC-III* at 287. The District Court found that DOJ had released all previously officially disclosed information, no longer applying the previously employed alternative analysis regarding the question of whether the privilege had been waived. *See id.* at 287-88.Despite this ruling, DOJ released a redacted version of the two opinions in question, in which only the exact information which had been previously disclosed was revealed. *See NSC-III* at 287. The District Court found that DOJ had released all previously officially disclosed information, no

10

longer applying the previously employed alternative analysis regarding the question of whether the privilege had been waived.  *See id.* at 287-88.

In the interim period between the briefing of the above Exemption (b)(5) matters and the District Court's opinion, Congress added a provision to FOIA requiring the Government to demonstrate that "the agency reasonably foresees that disclosure would harm an interest protected by an exemption."  5 U.S.C. § 552(a)(8)(A)(i)(I).  On 4 October 2016, NSC asked the District Court to reconsider its last ruling on this question, stating that the intervening change in controlling law warranted further briefing on the foreseeable harm standard.  *See* JA at 45.  The District Court held that the new law did not constitute an intervening change in controlling law because it only applied to FOIA requests filed after 30 June 2016. *Id.*

*Sanctions and Related Matters:*

In December 2011, NSC's counsel received two CIA documents—cumulative indices of *Studies in Intelligence* articles—from a third party that he later concluded may have contained classified information.  *NSC-II* at 128.  After he provided the documents to the Federal Bureau of Investigation ("FBI") for sanitization, as directed by the Government's counsel, FBI reversed its position and refused to provide NSC with sanitized copies that it could use as evidence in this case.  *Id.*  After NSC petitioned the District Court for relief, the District Court

11

ordered CIA to release sanitized copies of the two indices to NSC "with all classified information redacted therefrom." *Id.* CIA then released copies of the indices to NSC, but redacted both classified information and unclassified information it claimed was covered by the CIA Act, without indicating which redaction markings corresponded to which type of information. *See* JA at 673-96.

NSC then petitioned the District Court again for relief, and the District Court ordered CIA to "clearly indicate on each document (1) the portion(s) redacted as classified and (2) the portion(s) redacted pursuant to the CIA Act." *Id.* at 704. However, the resulting release, *id.* at 710-32, bore markings which were completely inconsistent with CIA's other evidentiary submissions, indicating that information listed in the *Vaughn* index as classified was unclassified, and vice versa. *See id.* at 733-34. After a status conference in which it directly questioned CIA's counsel about these discrepancies, JA at 1470-98, the District Court ordered that "the plaintiff is entitled to rely on the designations of information in the two . . . indices at issue, as provided by the defendant, regarding whether redacted information in those documents is either classified or subject to protection under the CIA Act." *NSC-II* at 129.

On 22 October 2012, CIA filed copies of the indices with the Court, in which the redactions were clearly marked "Ex. (b)(1) Classified" or "Ex. (b)(3) CIA Act." *See* JA at 1582-1606. "In the versions of the two documents attached to the CIA's

12

October 22, 2012 notice, however, the CIA had reversed its designations, as compared to the September 27, 2012 filing.  The CIA's notice did no[t] acknowledge that its previous representations had been in error but, just as plaintiff's counsel had warned two months earlier, information that had earlier been marked as classified was now marked as withheld under the CIA Act, and vice-versa." *NSC-II* at 130.  NSC asked the District Court to sanction CIA and DOJ for the misrepresentation, stating that "it is not maintaining that CIA's opposition to the initial Motion to Compel was sanctionable conduct, nor is [it] saying that the making of the mistake in the first place was sanctionable conduct.  . . . It was not until CIA refused to acknowledge the mistake, forced the extensive subsequent arguments, and repeatedly represented to the Court that its assessment was correct and [NSC's counsel] was wrong that the actions of its counsel became worthy of sanction." *Id.* at 136.  After a hearing, JA at 2448-79, and supplemental declarations, *id.* at 2480-2501, the District Court declined to impose sanctions. *NSC-II* at 137.

### SUMMARY OF ARGUMENT

The District Court erred by concluding that CIA properly refused to process FOIA requests and that the related patterns, policies, or practices were either justified or not properly before it.  The District Court also erred by concluding that CIA conducted adequate searches for responsive records, and that NSC had waived

13

its argument to the contrary.  The District Court also erred by concluding that CIA, DIA, DOJ, and ODNI released all non-exempt information.  Lastly, the District Court erred by not imposing sanctions on CIA and/or its counsel and by not referring several of the agencies' determinations to OSC.  The Court should reverse—or, in certain instances, remand—this case.

## ARGUMENT

NSC seeks a reversal of the District Court's rulings identified above.

## I.    STANDARD OF REVIEW

The Court reviews substantive FOIA decisions *de novo*.  *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009).  It must view all facts in controversy in the light most favorable to the non-moving party.  *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006) (quoting Fed. R. Civ. P. 56(c)).  The Court reviews denials of amendment motions, sanctions motions, and motions for reconsideration for abuse of discretion.  However, the Court reviews questions of law *de novo*.

## II.    CIA'S REFUSAL TO PROCESS REQUESTS

This portion of the instant case largely revolves around three practices of CIA's FOIA office, through which it refuses to process requests for aggregate data (e.g., a listing of the results of sorting a database), disingenuously hides behind the alleged configuration of its records systems in order to claim that requests do not reasonably describe the records sought, and deliberately interprets requests too

14

broadly in order to claim that conducting a search would impose an undue burden. This case challenges these practices both in the abstract and in the context of specific requests.

## A. SORTING A DATABASE IS NOT CREATING A RECORD

The fact pattern behind this request is simple: the CIA FOIA office uses a database named the CIA Automated Declassification Release Environment ("CADRE") to track its processing of FOIA requests. *See* JA at 2715-16. That database includes numerous fields, one of which is fee category (e.g., commercial, educational, or news media). *See id.* at 115 (CADRE listing of commercial requesters), 196 ("Fee category is not a mandatory field."). On 8 August 2010, NSC requested CADRE listings of all FOIA requesters from Fiscal Years 2008-2010 according to the fee categories to which CIA assigned them, *id.* at 103-15, and CIA refused to process the requests, ultimately arguing that doing so would require it to create a new record. *NSC-II* at 160. Addressing this point in two different opinions, the District Court concluded that while "CIA is *capable* of creating the record," *id.*, it is not required to because "producing a listing of search results or a listing that summarizes or describes the contents of an electronic database is akin to the creation of a record, rather than being akin to conducting a search." *Id.* at 160 n.28.

15

The District Court's strained reasoning lies at odds with the longstanding rule, recognized in its first opinion, that "[s]orting a database by a particular data field (*e.g.*, date, category, title) is essentially 'the application of codes or some form of programming,' and thus does not involve creating records." *NSC-I* at 270 (quoting H.R. Rep. 104-795, 104th Cong., 2d Sess. 22 (1996)). *See also People for the Am. Way Found. v. DOJ*, 451 F. Supp. 2d 6, 14 (D.D.C. 2006) ("Electronic database searches are . . . not regarded as involving the creation of new records.") (quotations omitted).

It is undisputed that "FOIA imposes no duty on the agency to create records." *Forsham v. Harris*, 445 U.S. 169, 186 (1980). However, as noted above, sorting a database by a field is not creating records, and releasing the information which resulted from that sorting action is *also* not creating records. While the District Court's reading would be correct in the context of paper records, or even electronic records stored outside a database, it makes no sense in the context of a database. Contrary to the District Court's assertion that "[p]roducing a listing or index of records, however, is different than producing particular points of data (*i.e.*, the records themselves," *NSC-I* at 271, such a list *is* the particular points of data, since there are no "records" to speak of in an electronic database in which information is entered into fields.

The District Court's error can be traced to a misconception—fostered by CIA—about how FOIA applies to databases at all.  This misconception is best highlighted through an example from elsewhere in this case.  CIA was required to process and release information from CADRE about several FOIA requests.  Many of the released records were screenshots of CADRE in which text is visibly missing because a user would have to scroll vertically or horizontally in the application to read it all.  *See* JA at 3031-65.  When NSC argued that this response was inadequate because CIA had not produced all of the responsive *information*, CIA countered that the screenshots "are the best available copies of these materials and reflect all of the information that can be viewed in a CADRE entry short of having actual access to the system."  *Id.* at 3496.

This assertion exemplifies CIA's view of how FOIA applies to databases, and it explains the District Court's conclusion.  If FOIA is about *records*, then CIA's response makes sense, but if FOIA is about *information*, then CIA's response would be patently improper.  A screenshot of an application which only shows some of the information in a database would never be an adequate response to a request for *information* in the database, but it would be sufficient if the data in the database were considered non-responsive to FOIA requests because a requester would not "hav[e] actual access to the system."  *Id.*  When CIA went on to complain that "[r]eproducing any stray text that might not be visible in a screenshot

17

would be exceptionally burdensome as it would require personnel to compare the screenshots with the database content to determine whether the field visible in the screenshot contains the same information in the database, and then, to the extent that the two records differ, create a new record in a different format with that new information," *id.*, it showed its bias. In effect, it claimed that it would be forced to create a record in order to release the information it had already chosen to retain in its database, and therefore that information was not accessible under FOIA. Congress already addressed this argument, stating that under it, "it would be virtually impossible to get records maintained completely in an electronic format, like computer database information." H.R. Rep. 104-795 at 22.

Viewed through this lens, the District Court's error is clear. "The focus of the [FOIA] is information, not documents." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). If information resides in a database, and sorting that database to find information does not constitute creating a record, then printing the results of that sorting action does not constitute creating a record. The primary case cited by the District Court, *People for the American Way*, does not contradict this. In that case, the list in question would have been generated from PACER, a database which DOJ *did not control*. 451 F. Supp. 2d at 14. Performing a search of PACER on a DOJ computer in response to a FOIA request

and then printing the results of that search would constitute the creation of a record *by DOJ*, because DOJ did not already choose to retain the information in PACER.

In contrast, CIA already retains all of the information in CADRE, and therefore sorting and printing that information does not constitute creating a record. *See Schladetsch v. HUD*, No. 99-0175, 2000 WL 33372125, at *3 (D.D.C. Apr. 4, 2000) ("Because [agency] has conceded that it possesses in its databases the discrete pieces of information which [plaintiff] seeks, extracting and compiling that data does not amount to the creation of a new record."), *appeal dismissed voluntarily*, No. 00-5220 (D.C. Cir. Oct. 12, 2000); *Int'l Diatomite Producers Ass'n v. SSA*, No. 92-1634, 1993 WL 137286, at *5 (N.D. Cal. Apr. 28, 1993) (giving agency choice of compiling responsive list or redacting existing lists containing responsive information), *appeal dismissed*, No. 93-16723 (9th Cir. Nov. 1, 1993).

**B.    CIA CANNOT HIDE BEHIND THE CONFIGURATION OF ITS RECORDS SYSTEMS**

It is well established that "[a]gencies are not required to maintain their records or perform searches which are not compatible with their records systems," *Assassination Archives & Research Ctr., Inc. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989). However, CIA has gone a step beyond this general rule, restricting its definition of what it means to "reasonably describe the records sought" in terms

of the request's compatibility with existing indexing systems.  32 C.F.R. §§

1900.02(m), 1900.12(a).  In doing so, it impermissibly interpreted Congress's

intent. *See*, *e.g.*, *Dominion Resources*, *Inc. v. United States*, 219 F.3d 359, 365 (4th

Cir. 2000) ("If a court, employing traditional tools of statutory construction,

ascertains that Congress had an intention on the precise question at issue, that

intention is the law and must be given effect notwithstanding any contrary agency

interpretation.") (citing *Chevron U.S.A.*, *Inc. v. Natural Resources Defense

Council*, *Inc.*, 467 U.S. 837, 843 n.9 (1984)).

The statute's legislative history is the first tool of statutory construction a

court utilizes to determine congressional intent when statutory language is unclear.

*See Toibb v. Radloff*, 501 U.S. 157, 162 (1991).  The legislative history of FOIA is

rich and has been cited by many courts.  *See*, *e.g.*, *Truitt v. Dep't of State*, 897 F.2d

540, 544-45 (D.C. Cir. 1990) (discussing legislative history of 1974 FOIA

amendments as related to requirements for describing requested records):

> The language "request for records which . . . reasonably describes such
> records" was inserted in 1974 [as § 1(b)(1) of Pub. L. No. 93-502] in
> replacement of the words "request for identifiable records," the
> terminology of Section 3 as originally enacted in 1967.  Although the
> committee reports in both houses of Congress had declared that a
> "request for identifiable records" involved no more than a reasonable
> description enabling agency personnel to locate the records sought, and
> had warned that the 1967 statutory formulation was "not to be used as
> a method for withholding," the 1974 Senate Report noted that "cases
> nonetheless have continued to arise where courts have felt called upon

> to chide the government for attempting to use the identification requirements as an excuse for withholding documents."

*Id.* at 544 (footnotes omitted).

A more direct examination of the legislative history reveals extensive discussion attesting to how this amendment was supposed to "directly aid citizens in obtaining Government documents." 120 Cong. Rec. 6,807 (1974) (statement of Rep. Erlenborn). *See*, *e.g.*, H. Rep. 93-876, 93d Cong., 2d Sess. 5-6 (1974) ("Section (1)(b) of the bill is designed to insure that a requirement for a specific title or file number cannot be the only requirement of an agency for the identification of documents."); H. Rep. 93-876, 93d Cong., 2d Sess. 6 (1974) [hereinafter 1974 House Report]; S. Rep. 93-854, 93d Cong., 2d Sess. 10 (1974) ("Agencies should continue to keep in mind . . . that their superior knowledge of the contents of their files should be used to further the philosophy of the act by facilitating, rather than hindering, the handling of requests for records.") (quotations omitted) [hereinafter 1974 Senate Report]; *id.* (asserting that the amendment "makes explicit the liberal standard for identification *that Congress intended* and that courts have adopted, and should thus create no new problems of interpretation") (emphasis added) (cited by *Truitt*, 897 F.2d at 545); 120 Cong. Rec. 6,809 (1974) (statement of Rep. Thone) ("Some agencies have interpreted [the 'identifiable records'] language so that a citizen can obtain a document only if he or she knows the precise title or the file

21

number.  To prevent such pettifoggery, we propose to amend the law so that agencies will have to respond to any request which 'reasonably describes such records.'").

In the case of the regulations cited as justification for deeming these requests "not reasonably described," it is important to note that while 32 C.F.R. § 1900 was first published in 1973, neither the language

> Reasonably described records means a description of a document (record) by . . . descriptive terms which permit an Agency employee to locate documents with reasonable effort *given existing indices and finding aids*,

32 C.F.R. § 1900.02(m) (emphasis added), nor

> Commonly this equates to a requirement that the document must be *locatable through the indexing of our various systems*,

32 C.F.R § 1900.12(a) (emphasis added), appeared until much later.  The regulation first mentioned "indexing or filing components" in any manner in 1975, and only then as a tool available to the responsible components.  32 C.F.R. 1900.41(a) (1975) ("Upon receipt of a copy of a request . . . the 'responsible components' . . . shall, with such assistance as may be appropriate from . . . such reference, indexing or filing components as may have . . . responsibilities with respect to any such records, undertake to locate the requested records.").  In 1976, the language "The request . . . shall reasonably describe the records of interest" first appeared in 32 C.F.R. § 1900.11(c) without any clarifying remarks (presumably pursuant to the

passage of the 1974 amendments), where it would remain unchanged until 1997. It was not until 1997, after twenty-eight years of mentioning "indexing and filing components," that these two regulations actually contained the current language and fundamentally changed the regulation from encouraging responsible components to utilize indexing and filing tools to requiring that requesters couch their requests in terms of those tools.

The Court need only consider the examples provided to the District Court to see how disingenuously CIA has implemented this common sense rule in order to avoid processing FOIA requests which a reasonable agency would have easily understood. *See* JA at 136, 138-40, 156-58, 160, 163-68, 171, 173, 176-77, 181. Instead of evaluating this evidence, the District Court held that NSC had not alleged in its First Amended Complaint that CIA had disingenuously hidden behind the configuration of its records systems in an attempt to thwart otherwise proper FOIA requests, *NSC-I* at 275-77, but only alleged that CIA was considering the configuration of its records systems when making determinations about whether a request reasonably described the records sought. *Id.* Because the latter idea is fundamentally sound, the District Court dismissed NSC's count.

However, this over-narrow reading of NSC's First Amended Complaint is not supported by sound law or policy, especially in light of the District Court's

response when NSC attempted to cure the alleged deficiency.  NSC's complaint merely stated:

> Undersigned is aware of numerous instances in which CIA has refused to process a FOIA request it deemed improper, stating that the request failed to "reasonably describe" the records sought. In a majority of these cases, CIA has cited the configuration of its records systems as a disqualifying factor. Upon information and belief, CIA's application of FOIA's "reasonably describe" requirement is significantly and consistently broader than is allowed by FOIA.  Upon information and belief, this activity represents an ongoing policy, practice, or [Standard Operating Procedure].

JA at 64.  Nowhere did NSC allege that citing the configuration of its records systems as a disqualifying factor was *by itself* a violation of FOIA.  Instead, it added that "*CIA's application* of FOIA's 'reasonably describe' requirement *is significantly and consistently broader* than is allowed by FOIA.*"  Id.* (emphasis added).  This second sentence makes it clear that it is *CIA's abusive interpretation* of the general rule regarding the configuration of records systems which is being targeted here.  No more detail is needed in a complaint.

Furthermore, when, in an attempt to resolve this matter, NSC attempted to amend its complaint to include the specificity the District Court required, *see id.* at 2431, that motion was denied.  *NSC*, 2013 U.S. Dist. LEXIS at *4-5.  The District Court argued that including the allegation that it had previously indicated would be against the law, *see id.* at *4 ("[T]he plaintiff is still correct in asserting that an agency may not hide behind the limitations of its records systems in refusing to

process FOIA requests."), was still insufficient because NSC did not "allege *factual material which would plausibly establish that an agency is actually 'hid[ing] behind the limitations of its own records systems.'" *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In doing so, the District Court misapplied *Iqbal*, since it is well-established that a plaintiff may still "plead[] facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted). In this case, the factual information on which the belief is based *was part of the record already*, and any more factual information would be "peculiarly within the possession and control of the defendant." *Id.* Moreover, the District Court had even specifically noted, "[I]t is worth observing that some of these examples include rather specific requests, such as a request for 'a copy of all publications/reports made by the [Director of National Intelligence] Open Source Center for January of 2009.'" *NSC-I* at 277 n.34 (quoting JA at 163). Therefore, the District Court abused its discretion when it held that this amendment would be

futile, and in doing so it highlighted the error it had made in dismissing the claim in the first place.[2]

## C. CIA CANNOT OVERGENERALIZE A REQUEST TO MAKE IT OVERBROAD

Just as CIA has demonstrated a pattern of deliberately misreading requests so that it may determine that they do not reasonably describe the records sought, it also deliberately misreads requests so that it may determine that they are overbroad, generally by asserting that it "would be required to search every office for any documents." *NSC-II* at 161. This case involves one such request, which sought all CIA records about the IBM supercomputer named "Watson"—of *Jeopardy!* fame— which CIA refused to process. JA at 275-80. Because NSC did not wish to blindly speculate about what types of records CIA might have discussing Watson, since agencies are presumed to have significantly superior knowledge of their records systems, it did not limit the request to a particular office or a particular type of record. Instead it explained its interest and suggested the types of records which

---

[2] The District Court also abused its discretion in determining that the other amendments would also be futile, since it imposed an exhaustion requirement where none is required by law. *See id.* at 5 (holding that requesters are required to respond to or appeal letters rejecting requests as "not reasonably described"). Moreover, it abused its discretion when it denied NSC's renewed motion to amend, even though the Circuit had just ruled, *Citizens for Responsibility & Ethics in Wash. v. FEC*, 711 F.3d 180, 188 (D.C. Cir. 2013), that such a letter did not trigger an appeal requirement. JA at 18.

might be found: "'Watson' represents the next generation of computing, able to parse natural language well enough to compete with champions on *Jeopardy!* As such, the applications of the technology that went into its development in the Intelligence Community are boundless. Records responsive to this request will serve as a case study for the CIA's involvement in artificial intelligence research." *Id.* at 277. Clearly this request is for records about how the development of Watson impacted the Intelligence Community, specifically with respect to the application of comparable artificial intelligence systems to intelligence analysis.

Despite the clearly delineated scope of this request, CIA ignored the requirement that a request need only "enable[] a professional agency employee familiar with the subject area to locate the record with a reasonable amount of effort," *see Judicial Watch v. Exp.-Imp. Bank*, 108 F. Supp. 2d 19, 27 (D.D.C. 2000), and reached its own determination—apparently without consulting any "professional agency employee[s] familiar with the subject matter," *id.*—that NSC must be asking for every record that mentions the word "Watson" anywhere in the agency. This overbroad reading of the request ignores both the specific context provided in the request and basic common sense. *Any* request can be read to encompass all systems in the agency if one does not read it critically, since any employee anywhere might send an email discussing a topic to another employee (a concern raised by the District Court, *NSC-II* at 163). Adopting CIA's reading of

27

the law, it can deny a request for all records about the most recent election in Burkina Faso because *someone somewhere* might have sent an email about it, even though a logical reading of the request would be to ask a professional agency employee familiar with West Africa what systems would be reasonably likely to contain responsive records.

This case demonstrates the manner in which CIA is in effect insisting that it be given full freedom to either interpret a request so narrowly that only a few records are deemed responsive or interpret it so broadly that it would have to search every agency system in existence. However, the key fallacy in this approach lies in one of the Government's most oft-cited citations in FOIA litigation: "[A] search need not be perfect, only adequate, and adequacy is measured by the reasonableness of the effort in light of the specific request." *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986). Searching every records system in existence might constitute a *perfect* search, but if a requester argued that such was required, an agency would argue that it would not be necessary or reasonable in light of the specific request. If an agency is allowed to argue that it is not required to conduct a wide-ranging search in the off chance that some random employee might possess a responsive record, then it cannot also be allowed to insist that the only possible interpretation of a request would require a wide-ranging search in the off chance that some random employee might possess a responsive record.

While there are requests where it would be reasonable to conclude that a wide-ranging search would be required (such as the District Court's hypothetical request for "all CIA records printed in the English language," *NSC-II* at 163 n.30), there is also a common sense requirement that all of the systems being cited as possible locations must be *reasonably likely* to contain responsive records. Every CIA system in existence is not reasonably likely to contain records about Watson. NSC does not know *what* CIA systems are reasonably likely to contain records about Watson, or what form those records would take, but it is not required to know such things, since it is not a professional agency employee familiar with the subject area.

## D. CIA'S PRACTICE OF NOT WORKING WITH REQUESTERS IS REVIEWABLE UNDER THE APA

According to CIA regulations, "Communications which do not meet the[] requirements [of reasonably describing the records sought and not requiring an unreasonable search] will be considered an expression of interest and the Agency will work with, and offer suggestions to, the potential requester in order to define a request properly." 32 C.F.R. § 1900.12(c). Instead of working with requesters to correct the deficiencies identified by CIA in their requests, CIA instead sends rejection letters which either contain formulaic suggestions about how to improve a request (e.g., "documents must be locatable through the indexing to our various

29

records," JA at 127-28, 133, 350, 368, 372, 438) or no suggestions at all. *See id.* at 127-81.

Even though CIA conceded that "a policy . . . which refuses to 'work with and offer suggestions to' potential requesters would violate its own regulation and could be set aside under the APA as agency action that is 'without observance of procedure required by law,'" it argued that NSC had not demonstrated that it *had* such a policy, citing the instances in which it did communicate with requesters. *See NSC-I* at 281. The District Court erred when it agreed with this argument, finding that NSC's complaint about CIA's unofficial practice of violating its regulation was merely a "generalized complaint[] about agency behavior." *Id.* at 282.

While it ostensibly relied on good law about the scope of the APA, the District Court misapplied the test for "generalized complaint" to encompass any widespread practice which was not written down and mandatory. This is not supported by any case law. Regardless of what an agency's published regulations reflect, agencies sometimes adopt unofficial practices which become *de facto* policies, and those practices are still amenable to APA review. Generalized complaints about how an agency conducts its business may not be reviewable under the APA, but a widespread practice which directly contradicts a published regulation is definitely reviewable under the APA. *See Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008) (reviewing challenge to an

agency's "decision . . . to adopt [an unwritten] policy of disclosing confidential information without notice' because such a policy was 'surely a consummation of the agency's decisionmaking process'"); *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 174-76 (D.D.C. 2015) (determining that plaintiffs had shown a reviewable unwritten "DHS policy direct[ing] ICE officers to consider deterrence of mass migration as a factor in their custody determinations" as underlying the plaintiffs' detention). "[A] contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'" *R.I.L.-R*, 80 F. Supp. 3d at 184 (quoting *Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003)).

## III.  CIA PERFORMED INADEQUATE SEARCHES

Although CIA performed inadequate searches in response to several requests, the District Court only adjudicated the adequacy of one search in controversy on the merits. Therefore, while this Brief will also include some discussion of the remaining four searches, the substantive discussion of those issues will be light, since the only question before the Court is whether NSC waived the right to challenge the adequacy of those searches. Should the Court find that the District Court erred in that regard, it should remand the case for further briefing and expansion of the record.

**A.    CIA PERFORMED AN INADEQUATE SEARCH FOR IMS SEARCH TOOLS AND DATABASES**

When NSC filed a request for records about the search tools and indices used by CIA's FOIA office for conducting searches of its own records, JA at 282, it was exploring CIA's consistent references to finding aids, search tools, and indices. *See*, *e.g.*, 32 C.F.R. § 1900.12(m) (referring to "existing indices and finding aids"); *see also* JA at 494-95, 752, 2515, 2991, 3005, 3008 (referring to "search tools [and] indices"). When CIA identified and released three records in response to this request, *NSC-III* at 259, it performed a patently inadequate search.

To see the problems with CIA's search, one need only consider a declaration filed by CIA in another case, in which the same declarant described a search for IMS records about Mandatory Declassification Review:

> In searching for current records, officers searched: (1) the internal Agency-wide regulatory database, which is located in the Classification Management and Collaboration Group ("CMCG") and contains all Agency regulatory issuances; (2) a CIA internal website, which maintains factual information from various components throughout the Agency; (3) a database of materials previously reviewed for FOIA release; (4) the computer drive of the CIA's liaison to the Interagency Security Classification Appeals Panel ("ISCAP"); and (5) a manual search of the physical files of IMS and CMCG management offices. In searching for archived records, officers searched the Agency's Space Management and Retirement Tracking System ("SMART2"). SMART2 is an automated inventory of records five years or older. The regulatory database, internal website, FOIA database, and SMART2 are the only systems of records within IMS designed to contain regulations, policies, instructions, and other

32

materials of the type sought by the Plaintiff. Other systems of records within IMS - for example, the CIA's Prepublication Review Board database, which is designed for case management of unofficial writings by current and former CIA employees - would not reasonably be expected to contain documents responsive to Plaintiff's request, and thus were not searched.

JA at 2518-19. In other words, in addition to the CADRE and SMART2 systems, Ms. Lutz identified at least three more systems of records which exist "within IMS" and for which records should have been released: (a) the internal Agency-wide regulatory database located in the CMCG; (b) the Prepublication Review Board ("PRB") database;[3] and (c) "other systems of records within IMS."

When presented with this evidence, the District Court initially denied summary judgment to CIA. *NSC-II* at 152. However, when CIA filed a renewed motion for summary judgment, the District Court granted it, even though CIA's entire discussion of its failure to search for records about those other IMS databases was the unsupported assertion that the term "databases" in the declaration proffered by NSC "referred to informal compilations of Agency records (not specific to IMS) maintained by individual personnel with an expertise in a particular subject matter (such as interagency security classification

---

[3] This database appears to be the same system referred to as "CIA-6: Manuscript Review Records" in the Privacy Act Systems of Records Notice ("SORN") published in the *Federal Register*. *See* 70 Fed. Reg. 42418, 42423 (July 22, 2005).

reviews or Agency regulations)." JA at 2717 (concluding that "[t]hese are not 'search tools' or 'indices' used by IMS when conducting searches of *its own records,* and therefore records concerning those compilations are not responsive to plaintiff's request.").

Moreover, CIA asks the Court to accept on faith that databases like "the internal Agency-wide regulatory database" and "the Prepublication Review Board database, which is designed for case management of unofficial writings by current and former CIA employees," 2518-19, are "informal compilations of Agency records (not specific to IMS) maintained by individual personnel," *id.* at 2717, even though at least one of them has a corresponding Privacy Act SORN which refers explicitly to "extant indices." 70 Fed. Reg. at 42423. Such a counterintuitive statement which stands in such contrast to common sense and basic logic should not be credited by the Court without some supporting evidence.

The focus on the definition of "search tools and indices" is especially telling if one looks beyond this case to more recent litigation. In a related case, NSC filed a request for records about search tools and indices used in the "Director's Area"— a former CIA component which housed such offices as the Office of General Counsel ("OGC"), the Office of Public Affairs, and IMS. *See* JA at 3008. In that case, the same CIA declarant made the bizarre statement that "[t]he phrase 'search tools and indices' is not a term of art used by information management

professionals," Suppl. Lutz Decl., Dkt. #84-1, ¶ 18 (filed July 11, 2014), *Nat'l Sec. Counselors v. CIA*, No. 12-284 (D.D.C.), despite being confronted with the overwhelming evidence of decades of CIA declarations using exactly that phrase.

While this statement demonstrates the type of semantic game that CIA is playing in the instant case, its response in that case also reveals a way forward for this case. According to the declarant, because "search tools and indices" is allegedly not a recognized term of art at CIA, it "reasonably interpreted this request as looking for records describing generally how components in the Director's Area search their records." *Id.* That response stands in stark contrast to the instant case, in which CIA aggressively defends its narrow interpretation of "search tools and indices" and uses that definition to justify refusing to search for and process more records. By CIA's own admission, a "reasonabl[e] interpret[ation]" of a request for all search tools and indices used by an office is "as looking for records describing generally how components in the [office] search their records." *Id.* On this the parties agree, and this case should be remanded so that CIA can conduct a search for all records describing generally how IMS components search their records.[4]

---

[4] For example, in the other case, the relevant offices "either searched their databases using key words, such as 'guides,' 'search guides,' and 'reference guides,' or conducted 'manual searches for database manuals and user guides' for responsive records." *Nat'l Sec. Counselors v. CIA*, 320 F. Supp. 3d 200, 207 (D.D.C.) (adding that "the manual searches included searches of the relevant 'databases, systems, or search tools for a search/user/reference guide or similar document for

35

In the final analysis, either CIA materially misrepresented the facts to the District Court, at which point the District Court was wrong to award summary judgment, or it unreasonably interpreted the term "search tools and indices" at which point the District Court was wrong to award summary judgment. Either way, the Court should remand the case.

**B.    NSC DID NOT WAIVE ITS RIGHTS TO CHALLENGE CIA's SEARCH**

As noted above, many of the administrative processing records released to NSC were screenshots of CADRE in which text is visibly missing because a user would have to scroll vertically or horizontally in the application to read it all. *See* JA at 3031-65. When NSC argued that this response was inadequate because CIA had not produced all of the responsive *information*, CIA countered that the screenshots "are the best available copies of these materials and reflect all of the information that can be viewed in a CADRE entry short of having actual access to the system." *Id.* at 3496. However, the District Court declined to adjudicate this controversy (and the challenge to CIA's failure to search for responsive records explicitly referenced in reference manuals), holding that NSC had waived its right

that particular database, system, or search tool,' and also included searches of 'the IMS SharePoint and internal webpage for records pertaining to these databases, systems, or search tools.'") (citation omitted).

to challenge these searches because, "[i]n the round of summary briefing that resulted in *NSC II*, the plaintiff specifically challenged the adequacy of the searches conducted by State and the NSA, but made no argument regarding the CIA's search efforts." *NSC-III* at 261. This decision was an error.

As an initial matter, NSC freely concedes that when CIA originally moved for summary judgment on the relevant requests, it had no reason to challenge the adequacy of CIA's searches. All of the information provided in CIA's declarations at the time supported an inference that CIA's searches were adequate. However, the flaws about which NSC now complains were, simply speaking, things that NSC *had no way of knowing at the time*. It was not until after CIA released numerous previously-withheld records—at the District Court's order in *NSC-II*—that the problems with CIA's search became apparent. Prior to viewing these records, no person could have been expected to know that CIA had only processed screenshots of CADRE and not the actual information in the database, or that it had failed to pursue the clear leads identified in the reference manuals it processed.

This is the type of fact pattern for which Rule 54(b) was designed, "where a controlling or significant change in the law *or facts* [has occurred] since the submission of the issue to the court." *Id.* at 262 (emphasis added). The new evidence, which was not available to NSC prior to *NSC-II*, clearly constituted a significant change in the facts. The District Court complained that, "to the extent

that the Court's prior holding in favor of the CIA failed to take into account the contents of the materials produced to the plaintiff, this is precisely *because* the plaintiff failed to bring this issue to the Court's attention in connection with the CIA's earlier motion." *Id.* In doing so, it disregarded the inescapable fact that "the plaintiff failed to bring this issue" to its attention *because* the plaintiff had no way of knowing about the issue at the time. In fact, had NSC opposed summary judgment based on the evidence in the record at the time, it would have opened itself up to accusations of frivolous litigation.

This last point reveals the strong public policy reason for reversing this case. Parties should not be required to challenge every single argument raised by their opponents, even the ones which they have no reason to think are wrong, *just in case* new evidence might develop later which would belie those arguments. If the Court affirms the District Court's ruling on this matter, FOIA litigants will be discouraged from *ever* conceding—or simply not challenging—*anything*, lest they forever waive the right to seek reconsideration if they later find out that they were misinformed. Therefore, beyond the controlling case law that "a motion for summary judgment cannot be deemed 'conceded' for want of opposition," *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 508 (D.C. Cir. 2016), the Court should remand this case because of the perverse consequences that an affirmance would create. This reasoning holds doubly true in FOIA cases, where a district court is required to

perform a *de novo* analysis of the case presented by an agency.  In such a case, justice requires that a district court reconsider its prior decisions under Rule 54(b) even in the absence of a formal motion, if later revelations in the case show that its previous decision was based on an incorrect understanding of the facts.

## IV.    AGENCIES IMPROPERLY WITHHELD INFORMATION

The issues with the withholdings in this case can be grouped into two main categories: (1) CIA's improper withholding of previously officially released information; and (2) all the agencies' improper invocation of Exemption (b)(5).

### A.    CIA IMPROPERLY WITHHELD PREVIOUSLY OFFICIALLY DISCLOSED INFORMATION

This issue is both minor in scope and major in importance.  Simply put, CIA takes the position that it is not required to check *its own publications* to determine if a piece of information has been previously officially released before withholding it, and that even if a requester demonstrates that information has been previously officially released, it can inform the Court that it has released all the information that *it* determined to be previously officially released, and the Court must afford it a presumption of good faith.  Both of these arguments stem from basically sound ideas, but, as with many other CIA practices explored in this case, are rendered unreasonable in the execution.

The first issue involves the burden of proof for proving prior official disclosure. In this case, NSC identified eighty-six pieces of information that CIA had redacted from the Tables of Contents, JA at 1935-2357, which had been previously officially disclosed elsewhere. *Id.* at 1708-1932. A significant majority of this information was either published on CIA's public website, in a published anthology of officially declassified articles,[5] or in a series of articles released to the National Archives. *Id.* at 1709. Despite the fact that NSC had shown that much of the previously officially disclosed information was located *on CIA's website*, the District Court adopted a strict reading of this Court's precedent from *Davis v. DOJ*, 968 F.2d 1276 (D.C. Cir. 1992), holding:

> As to the first argument, the Court agrees with the CIA that the plaintiff's argument is "based on the faulty premise that agencies are required to exhaustively search public sources to determine whether information is publically available before asserting FOIA exemptions." Agencies do not have an affirmative duty to ascertain whether information has been made publicly available before deciding to withhold it from release under the FOIA. . . . "[T]he task of proving the negative—that information has not been revealed—might require the government to undertake an exhaustive, potentially limitless search."

*NSC-II*, 960 F. Supp 2d at 168-69 (citations omitted) (quoting *Davis*, 968 F.2d at 1279). The District Court specifically addressed NSC's argument that a strict

---

[5] *Inside CIA's Private World* was published by Yale University Press at CIA's behest, *see id.* at 3959, and was comprised of articles that CIA had declassified or

application of *Davis* was unwarranted in this case, stating that "[i]t makes no difference that 'a significant majority of the officially disclosed information is present on CIA's website . . . or in other official CIA publications." *Id.* at 169 n.35.

It is on this point that the District Court's judgment became erroneous. As with many other issues in this case, there must be a practical limitation—a form of reasonableness component—to these general rules, so that agencies cannot abuse them at will. An agency can claim that a request does not reasonably describe the records sought if a professional agency employee familiar with the subject matter cannot *reasonably* determine what information is being requested, not if such a failure to understand would be unreasonable. An agency can claim that a request would impose an undue burden if every office could *reasonably* be expected to possess responsive records, not if there is simply a chance. And now, "an agency does not bear the burden of establishing an exhaustive public record search in the ordinary course of seeking summary judgment in a FOIA case," *id.*, but it does bear the burden of establishing a *reasonable* public record search, such as a search of its own website or of its "database of materials previously reviewed for FOIA release," JA at 2518.

---

otherwise officially released to the editor for the express purpose of inclusion in the book. *See id.* at 3960.

41

While the idea behind placing the burden of establishing prior official disclosure on the requester is sound in theory, it cannot be justified in situations like this. The fact that NSC was able to identify eighty-six pieces of previously officially disclosed information does not mean that there were not more. The prior official disclosure rule holds that information which has been previously officially disclosed is not withholdable under FOIA, but insisting that agencies are not required to do some minor form of due diligence (such as checking their own websites) effectively robs this rule of any power. The problem with this strict interpretation is exacerbated in a case where a requester *did* present evidence that a significant amount of previously officially disclosed information was withheld, thereby casting doubt on the agency's claims, and the District Court *still* did not order the agency to check to make sure it is not violating FOIA in ways the requester cannot deduce, but which are nonetheless violations of FOIA.

Even in the absence of an affirmative duty, though, CIA still failed to meet its burden of showing that it had not withheld previously officially disclosed information, and the District Court erred when it found that CIA had done so. After NSC presented its evidence of the eighty-six pieces of previously officially disclosed information, CIA informed the District Court that it had compared the withheld information with the public website and CADRE system, and that "[i]n instances where there had been a prior public release of the substantive information

for a given entry, i.e., the citation information for that article or the article itself had been previously disclosed either by way of the public website or through another form of official public disclosure, IMS released the identical information contained in the [Tables of Contents]." JA at 2417. The District Court credited this testimony, calling it evidence of "eminently reasonable efforts to determine whether information contained in the withheld records had been previously officially made available through any form of official public disclosure." *NSC-II* at 169; *see also NSC-III* at 251 ("Moreover, the Court credited the CIA's assertion that, based on its review of materials made available on its public website, the agency released 'any officially disclosed information' falling within the scope of the plaintiff's FOIA request as of November 2012.").

The problem with this decision is that it was based on false testimony from CIA. Despite its claims to the contrary, CIA continued to withhold the majority of the eighty-six pieces of previously officially disclosed information that NSC identified. After NSC brought this fact to the District Court's attention, CIA admitted that it had in fact done something qualitatively different than it had previously implied, arguing, "While the CIA produced the information that it determined had been officially disclosed, it did not claim, either in its declaration or its motion papers, that it produced the information that *Plaintiff alleged* was publicly available." *NSC-III* at 253. However, this was not what CIA's declarant

43

stated the first time. CIA stated without any caveats that it had released information in the Tables of Contents where "the citation information for that article or the article itself had been previously disclosed either by way of the public website or through another form of official public disclosure." JA at 2417.

Yet CIA did *not* release eighty pieces of information, most of which met that definition. *See id.* at 3665 ("[N]one of the previously officially disclosed information I identified in my 31 October 2012 *In Camera* Declaration (except for the classification codes mentioned above) has to date been released to NSC through this litigation."). CIA never indicated at the time that it had determined that the information published on its website somehow did not meet *its* definition of "officially disclosed," and the District Court relied on that. Moreover, after NSC brought this misrepresentation to the District Court's attention, it *still* credited CIA's testimony despite the overwhelming evidence to the contrary. *NSC-III* at 254 ("As before, however, the Court is not persuaded that the evidence proffered by the plaintiff meaningfully undermines the agency's assurance that it undertook reasonable steps to produce all non-exempt records responsive to the plaintiff's FOIA request.").

To support this conclusion, the District Court relied on the deference it was required to give to CIA's assertion that the information was classified. "With these eminently reasonable efforts to identify officially released information in mind, the

plaintiff's scattered examples of withheld information that may be otherwise publicly available does little to undercut the substantial weight accorded to an agency's affidavit concerning the details of the classified status of the disputed record." *Id.* at 255. There are two problems with this ruling. First, as a practical matter, if uncontroverted, independently confirmable evidence that information has been officially disclosed is not adequate to overcome the substantial weight a court must give to an unadorned statement that it has not, then nothing can overcome such a statement. Second, the District Court was wrong to invoke substantial weight in the first place, because CIA is only entitled to substantial weight with respect to a claim that information is *classified*, *not* that it has not been previously officially disclosed. If information has been previously officially disclosed, *no exemptions apply*; it does not matter if CIA believes it is classified or not.

Before completing this discussion of previously officially disclosed information, it is necessary to briefly address one further matter: that of the authors' names identified by NSC. As the District Court correctly stated, NSC "agreed to limit the scope of its challenge in Count Three of No. 11-443 to 'the redaction of titles in the Studies of Intelligence [sic] tables of contents.'" *NSC-II* at 170 n.37. As NSC informed the District Court, NSC made this concession prior to learning the extent to which CIA had withheld previously officially disclosed information, and when it learned more, it asked the District Court to "rule *sua sponte* on CIA's

45

withholdings of authors' names," *id.*, not once but twice. *NSC-III* at 256. The District Court denied the request both times, citing NSC's alleged waiver. *Id.* at 256-57. As with the search issue discussed above, this was judicial error. Not only can "a motion for summary judgment [not] be deemed 'conceded' for want of opposition," *Winston & Strawn*, 843 F.3d at 508, but a district court has "an affirmative duty to consider the segregability issue sua sponte . . . even if the issue has not been specifically raised by the FOIA plaintiff," *Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999). The District Court could not find that CIA released all reasonable segregable non-exempt information without considering the evidence NSC provided that many of the redacted authors' names had been previously officially disclosed, and so its failure to do so constituted error.

## B. ALL AGENCIES IMPROPERLY INVOKED EXEMPTION (B)(5)

Over the course of this litigation, all four agencies have released a significant amount of information, and all four agencies have withheld a significant amount of information. Of all of the withholdings not related to previously released information, NSC elects only to appeal the withholdings citing Exemption (b)(5), in which the agencies claim that information is covered by either the deliberative process privilege or the attorney-client privilege.

46

As a initial matter, however, the Court should remand this case in recognition of the passage of the FOIA Improvement Act of 2016, in which Congress added a provision to FOIA requiring the Government to demonstrate that "the agency reasonably foresees that disclosure would harm an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I). The District Court denied a motion for reconsideration based on this intervening change, holding that it did not apply to this case because the law only applied to requests filed after 30 June 2016. *See* JA at 45. However, this is not a logical reading of the statute, and the Court should remand this case so that the parties can brief the application of the foreseeable harm standard.

To be clear, NSC does not dispute the fact that the statute does include this sentence, but it does dispute that Congress intended this statement to mean that portions of the Act which *change the legal standard* only apply to new requests. It is a much more sensible reading to infer that Congress intended that portions of the Act which dictate administrative duties would only apply going forward, but that statements of "what the legal standard is" would "take effect on the date of enactment of the Act." To read it otherwise would mean that a person who filed a FOIA request in 2015, received a final response in 2019, filed an appeal, received a final appellate response in 2020, and filed suit in 2021 would still not be able to argue in Court that the Government was required to meet the foreseeable harm

standard simply because the request was filed in 2015. This is not a reasonable interpretation of the law.

Moreover, of the handful of other cases to encounter this issue so far, all but one have applied the foreseeable harm standard to requests filed before that date. *See Ecological Rights Found. v. FEMA*, No. 16-5254, 2017 U.S. Dist. LEXIS 197451, at *16-17 (N.D. Ca. Nov. 30, 2017) (applying standard to April 2016 request); *Abdul-Alim v. Wray*, 277 F. Supp. 3d 199, 210 (D. Mass. 2017) (applying standard to 2013 request); *Borda v. DOJ*, 245 F. Supp. 3d 52, 62 (D.D.C. 2017) (applying standard to 2013 and 2015 requests). *But see Edelman v. SEC*, 239 F. Supp. 3d 45, 54 n.5 (2017) (declining to apply standard to 2014 request). Since the Court must review whether or not information is subject to an exemption *de novo*, statutory changes to the definition of an exemption must be taken into account at the time of the Court's consideration of the issue.

### 1. Deliberative Process Privilege

CIA, DIA, and ODNI each withheld information under the deliberative process privilege, and a significant number of these withholdings were improper. These withholdings tend to fall into three categories: (1) search terms and results; (2) other processing-related information; and (3) reference documents. *See NSC-III* at 277, 279-83. Each of these categories raises distinct issues.

CIA justified its withholding of search terms and results by arguing that they were part of *preliminary* searches "to guide the agency's final response to a particular request," *id.* at 276, the results of which "prompt[ed] internal communications regarding the scope of a given FOIA request, whether particular records are responsive, and whether the agency may acknowledge the existence of otherwise responsive records." *Id.* at 277. The issue with this assertion is that it is belied by the released records, in which no allegedly "final" searches are performed and in which the FOIA office relies upon the allegedly "preliminary" searches virtually exclusively. Additionally, CIA bases its assertion that these records are predecisional on the wrong "decision." The relevant decision (to which something must be predecisional) is not the final determination on a FOIA request, but the final decision made by each component tasked with a search to use certain terms and send its results to the FOIA office as a presumably final offering. The fact that this response is presumably final is even reflected in CIA's argument, in which it claims that the FOIA office "incorporate[s] all of [the components'] recommendations regarding exemption, segregation, redaction, and release." JA at 2993.

In finding that such information was exempt, the District Court relied on the general rule that "it must be evident that 'the reasoning in the report is adopted by the agency as *its* reasoning, even when the agency's decision agrees with the

conclusion of a report.'"  *NSC-III* at 276 (quoting *Elec. Frontier Found. v. DOJ*,

739 F.3d 1, 10 (D.C. Cir. 2014)).  However, in applying this rule, the District Court

improperly put the burden on NSC to prove that IMS adopted the reasoning of any

other components, when it was properly CIA's burden to demonstrate that it did *not*

(and therefore that the information was properly privileged).  All NSC had to do

was raise a genuine issue of material fact to defeat a motion for summary judgment,

which it did.

DIA and ODNI's withholding of processing materials falls victim to the same

issue.  Each agency withheld records about discussions between offices (or

agencies), in which one office was either providing information to the FOIA office

or describing an action taken *by* the FOIA office.  For example, DIA described a

scenario in which "a referring agency may recommend asserting an exemption for a

particular reason, with the receiving agency responding to either agree with the

recommendation or propose an alternative response, *id.* at 280, and described

another document as providing "specific instructions on the release of the

information and the connection between [the] particular request and other requests

from the same requester," *id.*  The language used does not denote predecisional

deliberations.  If the FOIA office "agree[s] with the recommendation," *id.* at 280,

then it has adopted it, and "specific instructions" are directions, not recommendations.[6]

Lastly, CIA's justifications for withholding alleged "draft" reference or training documents is impermissibly conclusory and warrants only a brief mention. The District Court even observed that the "formulaic descriptions" provided little useful information, *id.* at 278, before ultimately deciding that CIA met its burden because, "[b]eyond simply labeling the withheld documents as 'drafts,' the agency has explained that each document is a 'pre-decisional draft.'" *Id.* Simply adding the word "pre-decisional" to a conclusory, self-serving declaration does not transform an insufficient offering to a sufficient one, and the District Court erred by granting summary judgment to CIA.

### 2.     Attorney-Client Privilege

CIA and DOJ both claimed that materials were covered by this privilege, but these claims are not supported by the record.

CIA, for its part, simply asserted that training materials and policies which were written by OGC attorneys were privileged because they "consist[] of advice discussing the administration of specific provisions of FOIA and the Privacy Act tailored to CIA records and information." *Id.* at 285-86.  Even though NSC argued

---

[6] ODNI's choice of language is similarly revealing.  One piece of withheld information analyzes what another agency is doing, and the other states whether a

51

that an "attorney [who is] educating staffers about their responsibilities under the law and telling them what to do" is not providing privileged advice, *id.* at 286, the District Court focused on NSC's alternative argument that the information had not been maintained confidentially, finding that they were properly exempt. *See id.* This was an error. These records are not legal advice, especially not legal advice *solicited by an Agency component.* They may have been written by lawyers, but they are statements of policy which are used by FOIA analysts as references.

OLC's withholdings present a different question, in that NSC does not allege that the opinions might not *normally* be considered privileged material, but instead argues that the privilege has been *waived* by the "clients." This is a distinct argument from prior official disclosure, which has led to the necessity of this appeal. Under a privilege waiver argument, information is not exempt under Exemption (b)(5) if it is not privileged, and if the privilege has been waived (as the term is understood in a privilege context), then it cannot be withheld.

The District Court initially recognized the distinction between the two arguments, expressing confusion at which argument NSC was making before proceeding to address them both. *NSC-II* at 197 n.70. It then noted that "voluntary disclosure of privileged material subject to the attorney-client privilege to unnecessary third parties in the attorney-client privilege context 'waives the

referral occurred. *See id.* at 282-83.

privilege, not only as to the specific communication disclosed but often as to all other communications relating to the same subject matter,'" *id.* at 198 (quoting *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997)), and ultimately concluded that the privilege had been waived for at least portions of two opinions. *Id.* at 198-99. Despite this ruling, DOJ released redacted versions of the two opinions in question, in which only the exact information which had been previously disclosed was revealed. *See NSC-III* at 287. The District Court found that DOJ had released all previously officially disclosed information, no longer applying the previously employed alternative analysis regarding the question of whether the privilege had been waived. *See id.* at 287-88. This was an error, since the District Court should have continued to apply the privilege waiver analysis, rather than switching to a prior disclosure methodology, which is significantly narrower. The error becomes even more apparent when one considers that the District Court even recognized that DOJ's declaration "stat[ed] little more than the general rationale for the preservation of the attorney-client privilege." *Id.* at 288.[7]

---

[7] Similarly, the District Court erred by failing to apply the privilege waiver methodology to the other instances in which NSC demonstrated that the privilege had been waived. *NSC-II* at 198-99. It exacerbated the error by insisting that *Davis* controlled, *id.* at 200, instead of recognizing that NSC had established a genuine issue of material fact and directing OLC to confirm that its "clients" had not waived the privilege. It is axiomatic that the attorney-client privilege is held by the *client*, and if the *client* releases the information, the *attorney* cannot treat it as privileged. *See generally In re Von Bulow*, 828 F.2d 94 (2d Cir. 1987).

As a final note, it should go without saying that in all of the above instances where the agencies improperly withheld information, they also failed to release all reasonably segregable non-exempt information.

## V.    SANCTIONS AND REFERRAL TO OSC SHOULD BE ORDERED

Because the facts related to NSC's sanctions motion are related in significant detail above, NSC will not reiterate them here.  Simply put, the District Court abused its discretion when it held that the actions of CIA's counsel were justified because the original FOIA officer made a mistake and they (DOJ counsel as well as agency counsel) refused to second-guess it despite being presented with ample evidence that it was an error.  Instead, CIA's counsel consistently informed NSC's counsel and the District Court that there was no mistake, and even went so far as to concoct an elaborate argument about the classification of information changing over time.  These actions froze the proceedings in place for two months and required numerous briefs to resolve, and all because CIA's counsel could not be bothered to investigate NSC's concerns.  This conduct is sanctionable.

Unrelated to the above sanctions, NSC also asks the Court to find that the circumstances of the case raise questions as to whether agency personnel acted arbitrarily and capriciously, triggering the duty of OSC to "promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible."  5 U.S.C. § 552(a)(4)(F)(i).  Several

instances of potential misconduct can be found in this case, most notably: (1) CIA's stubborn refusal to release all previously officially disclosed information in the Tables of Contents; (2) CIA's refusal to provide the information missing from the screenshots; and (3) DOJ's refusal to release unredacted copies of the two OLC opinions for which the District Court held that the attorney-client privilege had been waived.  Because the District Court ultimately ruled in the Government's favor on these matters, it did not address the matter of referral to OSC, but the question is still in controversy should this Court reverse any of the District Court's rulings.

## CONCLUSION

For all of the foregoing reasons, the Court should reverse and/or remand this case.

Date: February 6, 2019

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Appellant*

55

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of February, 2019, I filed the foregoing

with the Court's Electronic Case Filing system, causing a copy to be served via

electronic mail to Appellees' counsel of record.

Date: February 6, 2019

Respectfully submitted,


 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing filing contains 12,990 words, and was

prepared in 14-point Times New Roman font using Microsoft Word 2007.

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.